May it please the Court, Michelle McAloon Constance on behalf of Appellant MetLife. Co-Counsel Royal Oaks is here on behalf of the plan. We'd like to reserve two minutes for rebuttal. You may do so, Counsel. Thank you. Just watch the clock. Thank you, Your Honor. The appeal in this case implicates two of the District Court's rulings. The first, which remanded the claim back to MetLife, addressed the reasonableness of MetLife's determination that stock options awarded to plaintiffs were not predisability earnings under the terms of the plan. The second order addressed the valuation of those stock options post-remand. I will focus on the issues related to the first order. Co-Counsel Mr. Oaks will address the valuation issues. On November 6, 2002, MetLife approved disability benefits for plaintiff. In its letter approving those benefits, it calculated the benefits based on plaintiff's predisability earnings, including salary and bonus. For nearly two years, MetLife paid plaintiff disability benefits based on that calculation with no challenge from the plaintiff. In August of 2004, based on the medical information in the record at that time, MetLife determined that plaintiff was not entitled to continuing benefits. Plaintiff appealed that determination and, in fact, on appeal, for the first time, challenged the calculation of the benefits. On appeal, with respect to the disability determination, MetLife credited plaintiff's representation that he continued to suffer disabling pain and his representation that the reason he continued to work full-time, that in spite of the fact that he worked full-time for three years after his accident, that his performance was not the same and that he was not able to complete the same tasks that he had done pre-accident. Well, we come down to interpreting the language of the plan. Do we not? Predisability earnings? Absolutely, Your Honor. Absolutely, Your Honor. And the plan defines predisability earnings as salary or wage, as gross salary and wages, and within that definition comes. Commissions and or performance bonuses are also included. Why isn't this a performance bonus? Absolutely, Your Honor. It's not a performance bonus because, as number one, the PeopleSoft plan, the PeopleSoft disability manager, when contacted by MetLife, confirmed that while salary and bonuses were included within the predisability earnings calculation, stock options were not included within it. Well, now, that's the interpretation of the employer, either officially or inferentially. Does that bind the plan? Who, in the end, makes the determination as to what the plan specifically includes? In the end, MetLife, as claimed fiduciary, makes the determination. It does not bind MetLife as to the determination, but it is certainly evidence of the intent of PeopleSoft with respect to the language, and it's relevant to the analysis of the interpretation. So we're here to determine whether there was an abuse of discretion with respect to Met's determination that the stock options were not earnings. Absolutely, Your Honor. And the only evidence presented by plaintiff that they should fall within performance bonuses was a December 1993 letter from PeopleSoft which does not state that stock options are performance bonuses. It could be interpreted to state the opposite, but at best, it provides little insight on the issue of whether or not it falls within performance bonuses. In fact, there's substantial evidence in the record to support that stock options were not performance bonuses under the terms of the plan, including the underwriting file for PeopleSoft which makes no mention of stock options, including requests for proposals that had been submitted by PeopleSoft to MetLife by the broker, including the compensation data that was provided, the pricing of the premiums and the premiums themselves all support that stock options were not part of predisability. Would it have made any difference whether these were not stock options, but actual issuance of stock, grants of stock? Well, certainly, Your Honor, stock is more easily valued at the moment when it's value. In fact, there's an intrinsic variability and unpredictability to stock options at the moment of award and continuing. Well, the reason I ask you the question is because there's a Webster dictionary definition which includes stock as part of earnings, I believe is the term that's being described. Well, and, Your Honor, yes, stock is different than stock options. And in fact, if we look at how California courts, for example, who have interpreted terms that are relevant to the policy here, such as salary and wages, California courts have found that while bonuses are an element of wages, stock options are not. Because of the very nature of stock options as variable and unpredictable. But we're dealing with interpretation of a plan.   Yes, Your Honor. Let me ask you this. So where in the administrative record does it show that the plan committee undertook some interpretation of the terms of the plan such that they determined that the plan language excluded stock options? Absolutely, Your Honor. When plaintiff raised this issue for the first time, he submitted his 1993 offer letter. In response to that, MetLife reached out to PeopleSoft and asked PeopleSoft what the intent, whether or not PeopleSoft understood stock options to be included. That's PeopleSoft. Absolutely. So it was collecting information. It had the information that was submitted by plaintiff. It reached out and got PeopleSoft's understanding. And then in its letter, in its determination letter, in its decision letter that approved the disability benefits and addressed the calculation, it set forth the information that was in front of him, in front of it. It set forth PeopleSoft's explanation. And it stated that based upon the record, it determined that stock options were not included within predisability earnings. So the letter itself addresses this determination. It sets forth the evidence that was presented. And it states that it's making the determination that stock options are not, do not fall within the definition of predisability earnings. And, you know, it seems like there's two parts to this. One, the way one interprets predisability earnings in light of the plan language or the terms of the plan, and then whether or not what he received qualified as a bonus. Well, Your Honor, I think that the two are related in the sense that the question is whether the stock options here fell within performance terms. I mean, stock options could be part of earnings. Well, Your Honor, let's put it this way. If it was expressed that a stock option was going to be – there is a case that expressly – where the contract expressly focuses on merit bonuses being awarded through monetary means or through stock options. And in that case, we are – That's entirely reasonable, correct? Under the language in that case – No, I mean, broadly speaking, and, you know, executives get paid performance bonuses as part of their earnings. Well, executives get paid performance bonuses, and plaintiff here received – There's nothing novel about this. Pardon me? There's nothing novel about this situation. There's nothing novel about stock options being a form of compensation for executives. Absolutely, Your Honor. And awarded for bonus work, for incentive work, as an incentive. It's not novel, Your Honor, for that to be the case. There's nothing unique about this arrangement. Your Honor, that's true. But the question comes down to whether, under the terms of this plan, these options were performance bonuses. And even if it could be asserted that there was a reasonable position that they could fall within performance bonuses, certainly the evidence in the record supports – PeopleSoft's little e-mail response never says that – doesn't say that the stock options were not bonuses. It says that they were not included within predisability earnings, which includes bonuses. But it doesn't say that they weren't performance bonuses. But it says they're not predisability earnings, which performance bonuses are predisability earnings. It looks to me like they were trying to give their own interpretation of the plan, of what would be covered under the plan. I viewed it as them trying to explain their understanding of what fell within the predisability earnings. I mean, I'm sorry. If it was not within predisability earnings and it wasn't a performance bonus, there were performance bonuses included within the calculation of predisability earnings. It's just the stock options that were not included. You're losing time. I'm stealing my co-counsel's time. I'll allow him to. Now, it's co-counsel. We're still on the appellant side. Thank you, counsel. Good morning, Your Honors. And may it please the Court, Royal Oaks. Your Honors, I hastened to state at the outset that I think the issue I'm going to talk about, valuation, is not one that the Court needs to get to. Because I believe that my colleague's issue, Ms. Constan's issue concerning whether or not options are even part of predisability earnings. Well, my question may tie in. When did the company look at Mr. McAfee's 1040 in this whole process? It's in the record. And there's a very substantial amount declared in his 1040 for the appropriate year with respect to the sale of stock. Certainly. Help us with that. I think I can help. I'm glad Your Honor raised that, because it ties into, I think, the essence of my argument. My position is that to the extent the Court wishes to get to the question of what is the value of these options, if the Court says, okay, the options are earnings, which we don't think they are. But if you get to that point, then, Your Honor, we're faced with the fact that the discretion case for the Blankenship v. Liberty case. Now, given that fact, the trial court erred in using the contra profferentum doctrine, and the trial court erred in picking the valuation method it liked best. It was presented with three valuation methods, two of them presented by a plaintiff, each of which is inconsistent with the other. And it was presented with a very rational, fair-minded alternative by the expert for the administrator. Is it significant that the tax treatment of the issuance of an option, I'm not talking about the exercise, but the issuance of an option is zero in the year of issuance. The tax is collected at the time of the exercise. I don't know that that's significant for the outcome of this case, but the issue of the tax returns that Your Honor raised is significant in this respect. The first pass by plaintiff in saying to the administrator, we think that the value of our options is how much money did I make during my key year, my last year on the job. I exercised old options, and I made $300,000. And plaintiff's theory was that's how you value the options. Well, that was just flat wrong, because by that theory, you could pile up 10 years' worth of options, put them in your desk drawer, and then during your last year on the job, pull them all out, cash them in, and say, guess what? I just made an incredible amount of money. That's my baseline. Now you've got to pay me that incredible amount of money for the rest of my life. They abandoned that valuation method. Then we came along, and our administrator had a more rational approach. He said, let's look to find out how much a person actually was given by way of earnings in his key year as a reward for good performance. And that's what Dr. Findley, the USC economist, did. Then there was a third alternative approach to valuation. Plaintiff's second pass, if you will. He said, okay, I'm not going to go with my first approach about cashing in the old options in the drawer. I'm going to go with an alternative number two, which is how many options did I get during that last year I was on the job? $44,500. Multiply it times five bucks. That's how many dollars I should get toward my credit. Well, that was flawed as well, because as the administrator's expert pointed out, Your Honors, it was just four days into this gentleman's final year on the job that he was given 12,500 options out of the 44,000. Well, clearly, those options had nothing to do with his performance in the key year. So he would have gotten. That's not the way the plan was written, though. No, Your Honor. Actually, the way the plan was written is that the phrase in the plan is performance bonuses averaged over 12 months. And as Dr. Findley, the administrator's expert, pointed out, that does not mean there's a hard look back period of 12 months. You don't just simplistically count up the options. Well, that's the expert's view, but that's not the way the plan was written. Well, respectfully, Your Honor, I would interpret the plan performance bonuses averaged over 12 years to mean performance bonuses directed toward what this fellow did right that he was rewarded for in that final year. Is there any suggestion that the word bonus should be interpreted as implied to be limited to cash bonuses? Absolutely, Your Honor. And in our brief, we address that actually rather extensively, and we have authority indicating that the word wage, the word salary, and the word bonus is all limited to a fixed and finite term, fixed and finite amount of money. The punch line to this whole analysis, Your Honor, and I think this is the key to the valuation, is that the trial court was presented with differing approaches, different ways to interpret the phrase performance bonuses averaged over 12 months. But the abuse of discretion standard applies here and kicks in and states that if a reasonable person might agree with the administrator's take, that should be upheld. But the trial court didn't do that. The trial court very explicitly referred repeatedly to contra pro forensum and essentially substituted the word. He didn't actually rely. He didn't rely entirely on contra pro forensum. You're correct, Your Honor. Because he was in he applied, you know, he saw a conflict, a structural conflict. Yes. Right. And he had the benefit of our opinion in. In Witters. In a body. In Blankenship and a body. A body. And the Supreme Court's decision. In Glenn. In Glenn. Exactly. Your Honor. So things were a little. So the law was a little bit different the second time around. Well, but not really in this sense. I think it was unfair for the trial judge to use contra pro forensum in the way the trial judge did. Because whereas, yes, if there's a structural conflict, you can have a wary eye out to see if perhaps it infected the decision. Here the trial court acknowledged there was no bad faith. The trial court further acknowledged the fact that Dr. Findley, the administrator's expert, had a theory that appears very rational. Namely, let's look at what a person really earned during his final year on the job. Essentially, the trial court simply said at the end of the day, I prefer the other valuation method where you just count everything up. But, again, that could provide for a windfall or it could provide for zero. And as a result, neither of those theories really should be respected and used. The fact that the plaintiff himself offered two inconsistent theories about valuation, both of which are fatally infected with this flaw, that it could give a windfall if you count all. He could ask for the world. Excuse me, Your Honor. He could ask for the world. He could ask for as much as he wants, you know. Well, ultimately, what we're dealing with here is did the district court judge abuse him? Did he make an error of law? Well, I think there was two errors of law in using contraprofarentum, as he did, and, secondly, in abusing his discretion in not accepting the administrator's rational alternative. And I think maybe the key to the analysis is what my co-counsel mentioned, namely, plaintiff's actions speak louder than words. For 22 months after he submitted his claim, with full knowledge of the nature of the claim and the plan, he accepted the amount of money based on his $175,000 salary plus bonus, as the PeopleSoft e-mail described it. And only about two years after this. Wasn't he in pretty bad shape? Absolutely, Your Honor. I cannot question that. But I can also say that, based on the record, that he certainly is an intelligent, articulate person who has cooperated with his lawyer throughout this process. And so I think it's pertinent that for two years, given the very large gap between $7,000 a month and $23,000 a month, it's very significant that he essentially was agreeing with the interpretation of the company. Again, the rational interpretation provided by the counsel. Thank you, counsel. Our questions have taken you three minutes over time. Thank you, Your Honor. We'll hear from the other side. Please, the Court. Douglas DeVries for Appellee Ryan McAfee. The district court made two separate determinations, the first by summary judgment, which was preabate and also without applying contra profferentum, and made the policy interpretation, which was in fact the issue. It was related to the meaning of the terminology performance bonus. But it still comes down to what the word earnings means and to what extent performance bonus would include the issuance of stock options as opposed to cash bonuses. And what troubles me is the language in the Davidson case out of the Seventh Circuit where Judge John Minor Wisdom says employers grant stock options as an alternate form of payment, it is potential income for which the employer incurs no immediate liability. Only an employee can defer tax liability. It is not wrong for an employer to exclude the income from exercising stock options from the calculation of benefits. Now, why isn't the issuance of a stock option as opposed to the grant of performance-based cash bonus significantly different? Why should it be included in the term performance? And this was in fact the very determination the district court made. The terminology was that the predisability earnings, which is the term of art in the policy, would be calculated based on salary, which is money or income, or wages. So clearly wages was different than salary. And within wages, it would include performance bonuses. Then the question became, well, wages are certainly a broader category than money. Performance bonuses then in the context of this case, because it's a case-by-case analysis, the performance bonuses in this case under the higher letter, as the higher letter explained it, as explaining the executive incentive compensation plan of PeopleSoft was only stock options. There were no cash bonuses paid to executives under that plan. And so all of that was considered by the court. Then the determination of performance was that the stock options themselves were the ordinary form of compensation, and it's conceded by Metliff, it's an undisputed fact, that those stock options given to McAfee were compensation. It was compensation for services performed. And the amount he got was, according to the terms of the executive compensation plan, based on his performance, the company's performance, and his rank in the company. And the word compensation is expressly used as excluded under predisability earnings, which do not include awards, overtime pay, employer contributions, or any other compensation. So it doesn't help us to say it includes compensation. You know, I understand that. What I'm suggesting is that any other compensation, unless on the facts of this case, any other compensation that would not qualify as performance bonuses would fall under the other compensation term. But here we have a compensation program specifically for executives that says they're going to be compensated based on performance bonuses, keeping in mind McAfee, Mr. McAfee, was the vice president of technology of a high-tech software company. He was a key employee who was responsible for technology of the company. And his base salary, which was known because, remember, he was in also the enhanced this is the enhanced plan for these very executives. So these terms are being defined in the context of the real compensation that they're receiving. In his case, a base salary that was only a, it's a lot of money, but it's $175,000. But that was the smallest part of his and the executive's compensation. The benefit amount under the plan was $25,000 a month. Clearly, that couldn't have been to cover $175,000 a year in salary. So that's a maximum. The $25,000 was a maximum, was it not? Yeah, per month. But the $175,000, so the only way you could get to a maximum benefit under the plan, clearly the plan contemplated and was underwritten to provide potentially $25,000. But all you're talking about is a ceiling. I'm talking about a ceiling applied to a specific enhanced plan that the participants could qualify for. They would only qualify if they made $42,000 a month in earnings. The only way they could make those earnings was to get these performance bonuses that we're talking about. That's why these were wages. These were the wages they received. And that's why I brought to the Court's attention as a supplemental authority the California Supreme Court's recent decision where the California wage law that MetLife brought up, citing the IBM v. Bagiore case here from the Ninth Circuit,  Well, the California Supreme Court held in Schachter v. Citigroup, which I filed a supplemental letter on, that, indeed, restricted stock in a stock purchase plan constitutes wages under the California wage law. And Stutz issued stock, and I made the distinction earlier between stock and stock options. Stock is taxable in the year in which it is received. Options are not. Schachter did not involve stock. Those were stock options. MetLife's trying to say, oh, Schachter involved stock. The way in Schachter the fact was that the person got restricted stock, and what they were allowed to do was to designate a portion of the salary compensation they were making in a given year. Before the end of that year, they could designate from 1 to 10 percent of that salary to be withheld as part of a deferred taxation incentive plan to be used by them to purchase stock in the next year. And that stock would be a value below market that would be determined according to, guess what, the Black-Scholes method that they're questioning or that we used for valuation. They would adjust the price by volatility and risk and whatever. And what the Court said was what the person actually was receiving in Schachter were, quote, retention-based conditional interests in stock or nonvested, quote, and that was determined to be wages. Now, on a different level, we talk about this is something that MetLife brought up. The California wage law is for a specific purpose, and that involved a forfeiture issue. It's never been applied to executive compensation programs, which is a separate reason to distinguish. We're dealing with interpretation of a contract in any event.  We're dealing with an insurance plan. Yeah. Not a statute. Scalia. What is the ultimate determination of what the meaning of a term in the plan is? And that is where we get into this argument about what the Court actually did. Well, I'm just asking you, who is the ultimate arbiter of what a term in the plan means? Is it not the trustee or the administrator of the plan? In an abuse of discretion standard? In the context of the plan, it is the plan administrator. The ultimate determiner is the Court, because the meaning of a plan, or in this case insurance policy term, is a matter of law to be decided by the Court. But in this case, and this is in reference to the e-mail, the employer was not the plan administrator. The employer was not the drafter and issuer of the insurance policy. Those were Metlife's jobs. And what Metlife did in this case was, Metlife simply determined that between involving undefined terms, which they failed to define, which are clearly ambiguous, which is the reason we're having these different interpretations, they chose the one that limited it to something less than wages and something less than performance bonuses. And as Mr. Okshia said, they chose it that it would have to be cash and nothing else but cash. But that is resolving an ambiguity against the insured under insurance policy, which is a violation of not only reasonableness, it's unreasonable and arbitrary to just choose that, but also under contra proferentum, which is an issue in the case and, again, which is why I brought the Montour decision to the Court's attention in the supplemental authorities, that Metlife has briefed and argued this case as if the traditional abuse of discretion rules under Jordan v. Northrop Grumman applied, and they don't apply. That this is a completely different analysis, and we're talking about the standard of review. Well, I'm talking standard of review only because they're suggesting that under traditional abuse of discretion, the Court had to accept any reasonable notion that they came up with, regardless of whether it was arbitrary, regardless in the sense of regardless if it just picked one alternative, regardless of contra proferentum. And as we briefed, this circuit has said that contra proferentum applies regardless of the standard of review applicable to the plan's claim determinations, because it's a question of law. And you apply contra proferentum as a rule of insurance policy interpretation, which is the Court's rule. And what this Court did, and what we're here about, is even if, well, and that is the case, but even if it weren't, this Court never applied contra proferentum in regard to the policy determination. It applied it only when the consultant thinly tried to rewrite the policy, and the consultant tried to rewrite the policy, to add requirements to it and to not value what was issued during the term. He just jumped from the court, from the district court's first determination on the policy issue to the second determination on the value. Yeah. He just used it as a factor at like, I'm sorry. You've been using contra proferentum pretty loosely. I'm sorry? I'm sorry. I don't understand what's going on here. But you've been using the term contra proferentum fairly loosely. Oh, if I am or appear to be, that's not intentional. The district court didn't use the doctrine of contra proferentum in its first interpretation. It did not. And it only used it very limitedly in applying a more skeptical abuse of discretion standard. Exactly. Because our case law is fairly clear that a pure use of contra proferentum only really exists in the context where there's de novo review. I happen to disagree with that. I cited all the cases in footnote 19 of my brief. I think we made it pretty clear, at least I thought we did in Blankenship, that contra proferentum only, when you have a situation where you're dealing with pure abuse of discretion review, you don't use, you can't, you don't resort to contra proferentum to interpret the plan. I, getting back to your original point, I agree with you. This Court did not apply contra proferentum as a rule of interpretation. It did not. This district, the district in this case did not apply it as a rule of interpretation. It alluded to it as a factor, as did the Court in Carden v. Aetna out of the Fourth Circuit, which met life, cited. It just followed exactly the same procedure in applying an abuse of discretion standard, and did not go into it. Let me ask you this one question. So it was not a legal error. In the evaluation, in the second part of this case, when the district court was doing the evaluation, why, he, he didn't accept the administrator's determination. Is that right? That's right. What was the basis for that? Why was he, why was that proper for him to do that? The district court rejected the met life's adoption of the consultant's analysis because it departed from met life's own interpretation of the policy and about which stock options were to be valued. It also rejected it because the consultant departed from all conventional standards applicable, those adopted by the Financial Accounting Standards Board, the Securities and Exchange Commission, and the Internal Revenue Service that are used routinely to value stock, stock options are routinely valued for accounting and tax purposes, and he adopted what he called the, quote, quasi equity approach as a vehicle to escape the bounds of the contract terms and, and the, the, the standards that applied to applying it. And then when the court corrected that and said, well, if you take not all his hypothetical and invented methods, but if you take what he actually said about value and apply it to the total stock that was, that was involved, you come up with the same value that the applicants or the claimants' consultant did. And he just decided that it, and which rightfully so, that it was unreasonable and arbitrary to, to take the approach that met life did. Thank you, counsel. Your time has expired. Thank you. The case just argued will be submitted for decision.
judges: O'scannlain, Trott, Paez